AMERICAN IRON AND STEEL INSTI-
TUTE, United States Steel Corporation,
National Steel Corporation, Republic
Steel Corporation, Wheeling-Pittsburgh
Steel Corporation, Inland Steel Company,
Armco Steel Corporation, Jones &
Laughlin Steel Corporation, Petitioners
in No. 74–1640,

Bethlehem Steel Corporation, Interlake,
Inc. and Allegheny Ludlum Industries,
Inc., Petitioners in No. 74–1642,

Sharon Steel Corporation, the Babcock &
Wilcox Company, Crucible Inc., Cyclops
Corporation, Detroit Steel Corporation,
Atlantic Steel Company, Lone Star Steel
Company, Continental Copper & Steel
Industries, Inc., the Timken Company,
Shenango Incorporated, Petitioners in
No. 74–1962,

Youngstown Sheet and Tube Company,
Petitioner in No. 74–2006,

CF & I Steel Corporation, Petitioner
in No. 74–2256,

v.

ENVIRONMENTAL PROTECTION
AGENCY, Respondent.

Nos. 74–1640, 74–1642, 74–1962,
74–2006 and 74–2256.

United States Court of Appeals,
Third Circuit.

Argued June 9, 1977.

Decided Aug. 10, 1977.

David McNeil Olds, Blair S. McMillin, Thomas C. Wettach, Thomas J. Duman, Reed, Smith, Shaw & McClay, David S. Watson, Peter G. Veeder, Frank J. Clements, Thorp, Reed & Armstrong, Pittsburgh, Pa., Max N. Edwards, Richard E. Schwartz, Collier, Shannon, Rill & Edwards, Washington, D. C., Richard E. Nolan, Henry H. Korn, Davis, Polk & Wardwell, New York City, K. Robert Conrad, Charles I. Bloom, Pepper, Hamilton & Scheetz, Philadelphia, Pa., David W. Furgason, William C. Robb, Welborn, Dufford, Cook & Brown, Denver, Colo., for petitioners in Nos. 74–1640, 74–1642, 74–1962, 74–2256.

H. Stephen Madsen, William W. Falsgraf, Baker, Hostetler & Patterson, Cleveland, Ohio, for petitioner in 74–2006.

Peter R. Taft, Asst. Atty. Gen., Raymond W. Mushal, Alfred T. Ghiorzi, Dept. of Justice, Washington, D. C., for respondent.

Before ADAMS, HUNTER and GARTH, Circuit Judges.

## OPINION OF THE COURT

ADAMS, Circuit Judge.

The EPA has moved this Court to recall the mandate and to amend the judgment in *American Iron and Steel Institute v. EPA (AISI I)*,[1] decided by us on November 7,

---

1. 526 F.2d 1027 (3d Cir. 1975).

The present opinion should be read in conjunction with the original opinion in *AISI I*. With respect to the technical details of the water pollution regulations at issue here, we shall assume familiarity with our earlier opinion which discusses such matters at length.

1975. Two primary issues must be considered in connection with such a request: first, whether—and, if so when—this Court has the power to reconsider and modify a judgment after the time for rehearing has expired; and second, whether the EPA's motion to recall the mandate should be granted under the circumstances present here.

## I.

This controversy originally arose when the American Iron and Steel Institute and several steel companies petitioned this Court to review water pollution regulations designed by the EPA. Promulgated for companies engaged in basic iron and steel manufacturing operations, such regulations established single-number effluent limitation standards for point sources in the industry.[2] In seeking judicial review, the Institute and the other petitioners challenged the authority of the EPA to issue effluent limitation regulations and contended that, in any event, such regulations failed to conform to the requirements of the Federal Water Pollution Control Act Amendments of 1972 (Act).[3] Although this Court held that the EPA has the power to issue the regulations in question,[4] the regulations

were deemed to diverge, in certain respects, from the statutory strictures.

Specifically, the *AISI I* panel ruled that the regulations were not consistent with § 301[5] and § 304[6] of the Act. We construed those provisions to require that the § 301 limitations represent "both the base level or minimum degree of effluent control permissible and the ceiling (or maximum amount of effluent discharge) permissible nationwide within a given category",[7] and that the § 304 guidelines "provide precise guidance to the permit-issuing authorities in establishing a permissible level of discharge that is more stringent than the ceiling."[8]

Consonant with such an interpretation, the EPA was instructed to promulgate, on remand, § 304 guidelines which would specify "permissible 'ranges' of limitations" and "factors to be taken into account" by permit-issuing authorities in setting effluent limitations for particular point sources.[9] Also, the Administrator was ordered to "reconsider the [§ 301] limitations with the base level and ceiling concepts in mind."[10] The matters to be dealt with on remand, and the underlying rationales, are delineated in considerable detail in the *AISI I* opinion.[11]

Immediately after our decision in *AISI I*, four other courts of appeals considered the

---

Subsequent to *AISI I*, this Court decided *American Iron and Steel Institute v. EPA*, 543 F.2d 521 (3d Cir. 1976) (*AISI II*). That later case concerned the jurisdictional question whether regulations that permitted adjustments in effluent limitations for certain individual point sources were reviewable by a court of appeals. But the panel ruled that such regulations were not reviewable.

Currently pending before this Court are several petitions for review of effluent limitation regulations applicable to "secondary" or finishing operations within the iron and steel industry. *American Iron and Steel Institute v. EPA*, Docket Nos. 76–1386, 76–1749, 76–1751, 76–1757, 76–2176 and 76–2232 (*AISI III*).

2. *See* 39 Fed.Reg. 24114, 40 C.F.R. §§ 420.10 *et seq.*

3. 33 U.S.C. §§ 1251 *et seq.* (Supp.1977).

4. 526 F.2d at 1035–42.

5. 33 U.S.C. § 1311.

6. *Id.,* at § 1314.

7. 526 F.2d at 1045.

8. *Id.*

9. *Id.*

10. *Id.* at 1047.

The "base level" and "ceiling" concepts are closely tied to the "range" issue. For purposes of this opinion, all subsequent references to "ranges" should be deemed to encompass the "base level" and "ceiling" principles as well.

11. Following the issuance of the opinion in *AISI I*, the EPA did not submit a petition for rehearing before this Court. Nor did it file a petition for certiorari with the Supreme Court. The EPA thus did not avail itself of the normal mechanisms for review of a panel decision.

"range" and "guidance" questions.[12] Each of these tribunals, however, reached a conclusion contrary to that of this Court: they sustained single number effluent limitation regulations, as designed for various industrial categories, and declined to order the EPA to reconsider or amend its § 301 and § 304 standards. As a result, the position of this Court with respect to the "range", "guidance" and related matters deviates from that of all other courts of appeals which have spoken on the issue.

Despite such a schism, the EPA has initiated efforts to develop regulations and guidelines for the iron and steel industry in conformity with the mandate of this Court. Nonetheless, we were advised at oral argument that only limited progress has been made in developing "ranges" and "guidance" factors. Perhaps such lack of advancement reflects the magnitude of the EPA's duties on remand as well as its anticipation that the Supreme Court would settle the uncertainty whether the tasks prescribed by this Court are required by the Act.

On February 23, 1977, the Supreme Court decided *E. I. duPont de Nemours and Company v. Train*[13]—its first foray into the interpretative morass surrounding § 301 and § 304 of the Act. That case concerned the review of a set of regulations crafted by the EPA for the inorganic chemical industry which are essentially identical in form to those implicated in *AISI I*. And the *duPont* Court approved the single-number effluent limitations as promulgated.

Thereafter, the EPA filed its motion to recall the mandate and modify the judgment in *AISI I*. The agency asserts, *inter alia,* that the construction of the Act as set forth in the opinion of this Court, together with the instructions to develop "range", "guidance" and related factors for regulation of the iron and steel industry, deviates from the Supreme Court's opinion in *duPont.*

Given this backdrop, we proceed to determine whether this Court may reconsider and modify a judgment following the expiration of the rehearing period and, if so, whether the relief that the EPA seeks is appropriate in the present context.

## II.

### A.

It is not surprising that there are relatively few precedents dealing with the question whether a court of appeals possesses the authority to recall a mandate. Undoubtedly, litigants may have been deterred from bringing "recall" petitions by the weighty policy interests which undergird the salutary principle that there should be an end to a controversy in litigation: Not only should parties be entitled to rely on a judgment as the final settlement of their dispute, but courts must be able to clear their dockets of decided cases in order to permit them to hear new controversies which have arisen and require resolution by the judicial process. Put another way, parties should be afforded ample opportunity to litigate their claims, but once a final disposition is reached they should not expect that the good offices of the court will be available for a chance to press their claims anew.

Despite these considerations, it would appear that an appellate court does have the power to recall a mandate in appropriate instances. Insofar as we have been able to ascertain, this Court has not

12. *See Hooker Chemicals & Plastics Corp. v. Train,* 537 F.2d 620 (2d Cir. 1976); *American Frozen Food Institute v. Train,* 176 U.S.App. D.C. 105, 539 F.2d 107 (1976); *FMC Corporation v. Train,* 539 F.2d 973 (4th Cir. 1976); *American Petroleum Institute v. EPA,* 540 F.2d 1023 (10th Cir. 1976); *duPont v. Train,* 541 F.2d 1018 (4th Cir. 1976); and *American Paper Institute v. Train,* 177 U.S.App.D.C. 181, 543 F.2d 328 (1976).

More recently, the Second Circuit reaffirmed its position regarding the "range", "guidance" and associated problems. *See California & Hawaiian Sugar Co. v. EPA,* 553 F.2d 280 (2d Cir. 1977). The Seventh Circuit has also joined the ranks of the above four courts of appeals. *U. S. Steel v. Train,* 556 F.2d 822 (7th Cir. 1977).

13. 430 U.S. 112, 97 S.Ct. 965, 51 L.Ed.2d 204 (1977).

spoken on the issue.[14] But many of our sister circuits have accepted, without question, the proposition that courts of appeals may vacate their judgments in certain limited circumstances.[15] Apparently, no court now takes the position that a federal tribunal lacks authority to recall its own mandate.

The source of the power to recall a mandate has not been conclusively identified. One court of appeals has discovered a "foundation in statute" for judicial authority to recall a mandate.[16] It points to 28 U.S.C. § 2106, which expressly authorizes an appellate court to affirm, modify or vacate any judgment as that court may deem to be "just under the circumstances." While, on its face, § 2106 seems to apply primarily to review by an appellate tribunal of a judgment or order of an inferior court, arguably the statute sanctions reassessment by a court of appeals of its own decisions as well.[17]

Most courts of appeals have rooted the authority to recall a mandate in the "inherent power" of a court. The Eighth Circuit, sitting *en banc*, has posited, for example, that a mandate may be recalled "[i]n the exercise of this court's supervisory power over [a] litigation and in order to protect

14. Within a footnote in *Root Refining Co. v. Universal Oil Products Co.,* 147 F.2d 259, 260 n.2 (3d Cir. 1945), this Court stated: "if no corruption [in procuring judgments] had been practiced this court would not have possessed the power to reopen its judgments or to recall its mandates after the end of the term." However, the *Root* decision subsequently was reversed by the Supreme Court, 328 U.S. 575, 66 S.Ct. 1176, 90 L.Ed. 1447 (1946), and so we are not bound by the sentiments expressed in the footnote.

More importantly, while it was once recognized that expiration of a court's term precluded any modification of an adjudication decided therein, see, e. g., *Bronson v. Schulten,* 104 U.S. 410, 26 L.Ed. 797 (1882), the "term" concept no longer retains much significance, especially since the enactment of 28 U.S.C. § 452. *See Greater Boston Television Corp. v. F.C.C.,* 149 U.S.App.D.C. 322, 463 F.2d 268, 276 (1971), *cert. denied,* 406 U.S. 950, 92 S.Ct. 2042, 32 L.Ed.2d 338 (1972).

Finally, it may be that the term restriction was somewhat less rigid than the *Root* Court believed. *See, e. g., Hazel-Atlas Co. v. Hartford Co.,* 322 U.S. 238, 244-45, 64 S.Ct. 997, 88 L.Ed. 1250 (1944).

15. *See, e. g., Reserve Mining Co. v. Lord,* 529 F.2d 181 (8th Cir. 1976); *Perkins v. Standard Oil Co. of California,* 487 F.2d 672 (9th Cir. 1973); *Powers v. Bethlehem Steel Corp.,* 483 F.2d 963 (1st Cir. 1973); *Aerojet-General Corp. v. American Arbitration Ass'n,* 478 F.2d 248 (9th Cir. 1973); *Greater Boston Television Corp. v. F.C.C.,* 149 U.S.App.D.C. 322, 463 F.2d 268 (1971); *Gradsky v. United States,* 376 F.2d 993 (5th Cir. 1967), *cert. denied, Grene v. United States,* 389 U.S. 908, 88 S.Ct. 224, 19 L.Ed.2d 224 (1967); *Legate v. Maloney,* 348 F.2d 164 (1st Cir. 1965); *Meredith v. Fair,* 306 F.2d 374 (5th Cir. 1962); *Yanow v. Weyerhaeuser Steamship Co.,* 274 F.2d 274 (9th Cir. 1958); *Hines v. Royal Indemnity Co.,* 253 F.2d 111 (6th Cir. 1958).

The Supreme Court also has recognized the power of federal courts, both trial and appellate, to alter or set aside judgments after their final entry. *See, e. g., Hazel-Atlas Co. v. Hartford Co.,* 322 U.S. 238, 244, 64 S.Ct. 997, 1000, 88 L.Ed. 1250 (1944), in which the Court stated:

[I]n most instances society is best served by putting an end to litigation after a case has been tried and judgment entered. This has not meant, however, that a judgment finally entered has ever been regarded as completely immune from impeachment . . . [U]nder certain circumstances . . . relief will be granted against judgments regardless of the term of their entry.

16. *Greater Boston Television Corporation v. FCC,* 463 F.2d 268 (D.C. Cir. 1971), *cert. denied,* 406 U.S. 950, 92 S.Ct. 2042, 32 L.Ed.2d 338 (1972).

17. Another court of appeals has suggested that Fed.R.Civ.P. 60(b) may constitute a basis for granting a recall motion, since that procedural provision permits a court "on motion and upon such terms as are just. . . . [to] relieve a party or his legal representative from a final judgment . . . [for] any . . . reason justifying relief from the operation of the judgment." *Yanow v. Weyerhaeuser Steamship Company,* 274 F.2d 274 (9th Cir. 1958). Nonetheless, there may be some question whether Rule 60(b) provides authority for recall of a mandate in the Third Circuit. This is so because, unlike the Ninth Circuit (*see id.* at 278), this Court has *not* generally construed the Federal Rules of Civil Procedure to apply to appellate proceedings. Nor does Rule 81 appear to make Rule 60(b) pertinent here. *See also Hines v. Royal Indemnity Company,* 253 F.2d 111, 113 (6th Cir. 1958), in which the Court declared: "The Rules of Civil Procedure apply to procedure in the District Courts, not to the Court of Appeals."

the integrity of this court's [earlier] mandate. . . ."[18] Likewise, a panel of the Ninth Circuit has declared: "The authority of a Court of Appeals to recall a mandate is not conferred by statute, but its existence cannot be questioned. . . ."[19]

Thus, although there are various possible sources of judicial power to recall a mandate, it is well recognized that a court of appeals has such authority. In light of this recognition, and reflective of the fact that the parties to the present controversy do not contest such a premise, we conclude that this Court may amend the judgment in *AISI I*, should such action prove appropriate.

### B.

While the parties do not dispute the elemental power of the Court to recall a mandate, they disagree as to whether such relief is in order in the case at hand. Before seeking to resolve this question, however, we first must define the parameters which will frame our inquiry.

■ The existing precedents provide some guidance as to when it is appropriate to amend a judgment after the time for rehearing has concluded. All of the courts of appeals have emphasized that recall of a mandate is an extraordinary remedy, one to be used sparingly. And their opinions teach that recall may be warranted for "good cause,"[20] to "prevent injustice,"[21] or in "special circumstances."[22] Such phrases indicate that exercise of the authority to alter a judgment falls within the *discretion* of the court, but that such discretion should be employed to recall a mandate only in unusual instances.

A few courts have attempted to enunciate specific standards for determining whether sufficient "good cause" exists to justify the recall of a mandate. The most pertinent opinion in this regard is *Greater Boston Television Corporation v. F.C.C.*[23] There, Judge Levinthal presented a series of hypothetical situations in which recall of a mandate might be proper, including (1) where clarification of a mandate and opinion is critical; (2) where misconduct has affected the integrity of the judicial process; (3) where there is a danger of incongruent results in cases pending at the same time; and (4) where it is necessary to revise an "unintended" instruction to a trial court that has produced an unjust result.[24]

*Greater Boston* also implicitly recognized a fifth criterion by reference to an earlier First Circuit opinion, *Legate v. Maloney*,[25] in which it was suggested that recall of a mandate might be justified if a subsequent Supreme Court decision "showed that [the] original judgment was demonstrably wrong."[26] In sum, then, the opinion in *Greater Boston* attempts to set forth guidelines as to when a court of appeals may properly amend one of its decisions—guidelines that may prove to be helpful in the present case.

■ Above all, though, recall of a mandate is a mode of relief that falls within the

18. *Reserve Mining Co. v. Lord*, 529 F.2d 184, 188 (8th Cir. 1976). *See, e. g., Powers v. Bethlehem Steel Corporation*, 483 F.2d 963 (1st Cir. 1973); *Perkins v. Standard Oil Company of California*, 487 F.2d 672, 674 (9th Cir. 1973).

19. *Aerojet-General Corporation v. American Arbitration Ass'n*, 478 F.2d 248, 254 (9th Cir. 1973).

20. *See, e. g., Aerojet-General Corporation v. American Arbitration Ass'n*, 478 F.2d 248, 254 (9th Cir. 1973); *Greater Boston Television Corporation v. F.C.C.*, 463 F.2d 268, 277 (D.C. Cir. 1971).

21. *See, e. g., Aerojet-General Corporation v. American Arbitration Ass'n*, 478 F.2d 248, 254

(9th Cir. 1973); *Gradsky v. United States*, 376 F.2d 993, 995 (5th Cir. 1967).

22. *See, e. g., Powers v. Bethlehem Steel Corporation*, 483 F.2d 963, 964 (1st Cir. 1973); *Greater Boston Television Corporation v. F.C.C.*, 463 F.2d 268, 280 (D.C. Cir. 1971).

23. 463 F.2d 268 (D.C. Cir. 1971).

24. *Id.* at 278–279.

25. 348 F.2d 164 (1st Cir. 1965).

26. 463 F.2d at 278 and note 12, *quoting Legate v. Maloney*, 348 F.2d 164, 166 (1st Cir. 1965).

ambit of a court's discretion. Ordinarily, such discretion should not be exercised to modify or vacate a prior judgment, absent good cause or unusual circumstances. And decisions concerning the propriety of such relief must be rendered on a case-by-case basis.

With these precepts in mind, we turn to a consideration whether recall of the mandate is warranted in the instant setting.

### III.

#### A.

In support of its motion to recall the mandate, the EPA primarily relies on the opinion of the Supreme Court in *duPont*[27] filed subsequent to the decision in *AISI I*. The agency maintains that the interpretation of the Act set forth in *AISI I* is "clearly inconsistent" with the statutory construction expressed in *duPont*. According to the EPA, the Supreme Court's approval of single-number effluent limitation regulations, roughly identical to those considered by this Court, obviates the need for development of "ranges" and "guidance" factors during the course of a remand in this litigation.

The EPA, in so arguing, seemingly endeavors to come within the reach of the fifth criterion adverted to in *Greater Boston*—that recall of a mandate might be appropriate when a later Supreme Court decision reveals that the original judgment was "demonstrably wrong."[28] But it is important to emphasize that we do not believe that the *duPont* case has, to any great extent, called into question the validity of the analysis in *AISI I*.

As we read *duPont*, that decision in no way sounds the dealth knell for *AISI I* that the EPA would have us perceive. To the contrary, the *duPont* opinion affirms much of the statutory interpretation espoused by this Court in *AISI I*. In both *duPont* and *AISI I*, a central issue was whether, under the Act, the EPA possesses the power to set industry-wide effluent limitation regulations. Like this panel, the Supreme Court concluded that the EPA does, indeed, have authority under § 301 to promulgate industry-wide regulations limiting effluent discharges.[29] Moreover, the *duPont* Court seemingly did not view *AISI I* with disapproval, citing our opinion no less than five times.[30] Had *AISI I* been wrongly decided, the Supreme Court surely would have been reluctant to refer to it in such fashion.

Even though *AISI I* appears to retain its fundamental vitality under *duPont*, we recognize that the Supreme Court specifically did not remand the regulations to the EPA for further refinement. Not only did the *duPont* Court decline to order the development of "range" or "guidance" factors for the § 304 guidelines, but it did not direct any alteration of the § 301 regulations themselves. Instead, the Court approved the single-number regulations as issued, recognizing that such limitations make "some allowance . . . for variations in individual plants . . . by including a variance clause . . . ."[31]

With respect to the duties imposed upon the EPA by § 304 of the Act, the *duPont* Court declared that the agency's use of subcategories satisfies Congressional expectations regarding a "range" of best practicable and best available treatment levels.[32] Also, the Supreme Court concluded that, under procedures adopted by the EPA, the purposes of the § 304 guidelines—including that of providing guidance to permit issuers—had been "substantially achieved." Such procedures entail the utilization of a development document and other support-

---

27. 430 U.S. 112, 97 S.Ct. 965, 51 L.Ed.2d 204 (1977).

28. *See* notes 25 and 26 and accompanying text *supra*.

29. *Compare* 430 U.S. at 126–136, 97 S.Ct. 965, *with* 526 F.2d at 1035–42.

30. *See* 430 U.S. at 126, 132, 97 S.Ct. 965.

31. *Id.* 430 U.S. at 128, 97 S.Ct. 965.

The observations in *AISI I* respecting the "variance" procedure, *see* 526 F.2d at 1046, have at best limited validity in light of such statements in *duPont*.

32. 430 U.S. at 130 and note 21, 97 S.Ct. 965.

ing materials as well as the agency's practice of obtaining comments on such materials and any proposed regulations.[33]

Because the EPA established, by subcategorization, a "range" of limitations within the iron and steel regulations and also followed the very procedures sanctioned in *duPont*, such as the employment of a development document and public input, it would appear that the EPA complied with the strictures of the Act. It follows, therefore, that remand of the regulations for development of "range" and "guidance" factors may well be incompatible with the reading of § 304 articulated in *duPont*.[34] At the very least, the requirements that this Court imposed on the EPA to be dealt with on remand cannot be said to be mandatory under the Act.[35]

The question remains, of course, whether the disparity between our opinion in *AISI I* and that of the Supreme Court in *duPont* is such as to warrant recall of the mandate. Despite the efforts of the EPA to fit the present case into the *Greater Boston/Legate* formula, it is questionable whether the *duPont* decision "showed that our original judgment [in *AISI I*] was *demonstrably wrong*."[36] Even so, we do not view the *Legate* test as an immutable rule with which literal compliance is required before a motion to recall may be granted. This is so since *Legate* itself did not involve a factual matrix in which a Supreme Court decision undermined the viability of a prior disposition by the First Circuit. Indeed, the reference to recall of a mandate based on a subsequent Supreme Court opinion constitutes dictum, intended only to demonstrate the natural skepticism with which the court

of appeals would view any motion to amend or vacate a prior judgment.

■ Although we are inclined to minimize the rigidity of the *Legate* model, the statements in that case remain pertinent to the matter before us. For *Legate* does call attention to the problems generated when the Supreme Court addresses issues that already have been adjudicated in the courts of appeals. Where, as here, a decision of the Supreme Court—the preeminent tribunal in our judicial system—departs in some pivotal aspects from those of lower federal courts, amendatory action may be in order to bring the pronouncements of the latter courts into line with the views of the former. As noted above, recall of a mandate traditionally has been warranted when and to the extent necessary "to protect the integrity" of a court's earlier judgment.[37] Certainly, such integrity may be jeopardized when the solemn declarations of a court are called into question by a later Supreme Court opinion. Recall of a mandate, in such a situation, would appear to be an appropriate response by a court of appeals.

In the present case, *duPont* places in doubt the necessity of the remand previously ordered and the concomitant requirement that the § 301 and § 304 standards for the iron and steel industry undergo further development. Because the Supreme Court approved the concept of single-number effluent limitations, without ordering separate § 304 guidelines specifying "ranges" and "guidance" factors, the decision in *AISI I*, insofar as it addressed such matters and

---

**33.** *Id.* 430 U.S. at 130–131 and notes 22, 23, 97 S.Ct. 965.

**34.** Speaking of the "subcategorization" concept in *AISI I*, this Court declared: "we disagree with the Administrator's contention that 'sub-categorization' provides a range." 526 F.2d at 1046. As to the employment of a development document, this Court did not consider such a procedure as satisfying the dictates of § 301 or § 304. *Id.* at 1046–47 and note 44. But such postulates evidently have become outmoded under *duPont*.

**35.** It is important to note that the Supreme Court permitted the American Iron and Steel Institute to submit a brief, as *amicus curiae*, in *duPont*. In such brief, the Institute urged the Supreme Court to adopt this Court's position respecting the "range" and "guidance" problems. But it would appear that the Supreme Court rejected, at least implicitly, the position advanced in the amicus brief.

**36.** *Legate v. Maloney*, 348 F.2d 164, 166 (1st Cir. 1965).

**37.** *See* authorities cited in note 18 *supra*.

imposed far more stringent demands upon the EPA, appears to be at odds with *duPont.* So as to eliminate such variances, and, more importantly, to protect the integrity of our earlier decision, modification of our judgment now seems justified under the unusual circumstances here.

We do not, however, award such relief merely on the basis of the incongruencies between *duPont* and *AISI I.* Additional factors, to be discussed below, support our view that the EPA's "recall" motion should be granted.

### B.

Among the hypothetical situations in which recall of a mandate might be proper, *Greater Boston* included instances portending "differences of result for cases pending at the same time." Judge Levinthal declared that the interest in "uniformity" in application of principles and in decision-making might constitute a "special reason for disturbing [the] repose and finality . . ." of an earlier adjudication.[38] While the *Greater Boston* tribunal evidently was concerned with promoting intra-circuit consistency, we believe that the interest in uniformity may transcend the territorial borders of any one circuit. Where a court of appeals finds itself opposed by the asseverations of the majority of its sister courts, then a reevaluation of its own position may be in order. This is especially so where the views of other courts of appeals fall more harmoniously into an alignment with the position of the Supreme Court.

In the situation before us, this Court has assumed a solitary position respecting the "range", "guidance" and related issues. At least five other courts of appeals have considered such questions, and each of them has reached a conclusion opposed to that adopted by this Court.[39] Speaking on the "range" issue, for example, the Second Circuit declined to rule that the effluent limitation regulations were invalid because the "EPA failed to establish permissible 'ranges' of discharges within each category or subcategory of existing point sources . . . ." Rather, that Court stated: "[w]e disagree with this argument and believe that whenever Congress spoke of 'ranges' in the debates over the Act, it meant only the spectrum comprised of varying discharge levels on a subcategorial, rather than individual, basis."[40] And the Supreme Court in *duPont* indicated that such an interpretation is the proper one.

Similarly, the Second Circuit, like the other courts of appeals that have discussed the "guidance" element, spurned the contention that the regulations violated the Act by neglecting to specify factors to be taken into account in determining the control measures and practices to be applied to point sources. Basically, the procedures that the EPA employed in setting the single-number effluent limitations were deemed by the Second Circuit to comply with the dictates of § 304 and the Act in general.[41] Again, such a proposition substantially was embraced by the Supreme Court in *duPont.*

In any event, it is clear that the decision of this Court on the "range", "guidance" and related matters departs from the position of the other courts of appeals. The result is a lack of uniformity between the

---

**38.** 463 F.2d at 278–79.

**39.** *See U.S. Steel v. Train,* 556 F.2d 822 (7th Cir. 1977); *California & Hawaiian Sugar Co. v. EPA,* 553 F.2d 280 (2d Cir. 1977); *American Paper Institute v. Train,* 177 U.S.App.D.C. 181, 543 F.2d 328 (1976); *duPont v. Train,* 541 F.2d 1018 (4th Cir. 1976); *American Petroleum Institute v. EPA,* 540 F.2d 1023 (10th Cir. 1976); *FMC Corporation v. Train,* 539 F.2d 973 (4th Cir. 1976); *American Frozen Food Institute v. Train,* 539 F.2d 107 (D.C. Cir. 1976); *Hooker Chemicals & Plastics Corp. v. Train,* 537 F.2d 620 (2d Cir. 1976).

In *U.S. Steel v. Train, supra,* which was decided after the *duPont* case, the Seventh Circuit briefly commented on the remand for a "range" of effluent limitations ordered in *AISI I.* The Court stated, *inter alia,* that "the Supreme Court's approval of single-number effluent limitations in *duPont* renders [the *AISI I* remand] conclusion questionable . . . ."

**40.** *Hooker Chemicals & Plastics Corp. v. Train,* 537 F.2d 620, 630 (2d Cir. 1976).

**41.** *Id.* 537 F.2d at 630.

treatment accorded the EPA's effluent limitations in this Circuit and the reception bestowed on such regulations by other courts.

■ Given such a setting, for this Court to eschew an opportunity to modify the mandate in *AISI I* would prove disruptive to the national program of water pollution control envisioned by the Act. Should we reject the recall motion, the EPA, as it represented at oral argument, would have to proceed to refine its regulations and guidelines as directed in *AISI I.* Once that task was completed, the EPA then would apply the newly developed regulations to the iron and steel industry. However, the EPA would continue to utilize its single-number regulations for other industries— certainly in *all* other circuits where the courts of appeals have rejected "range", "guidance" and similar requirements. Put another way, the pollution control regulations to be applied to categories of similar industrial dischargers would become discordant, with a special set of regulations to govern the iron and steel industry *and* perhaps other industrial categories in the Third Circuit alone.

In the face of such a consequence, and especially in view of the apparent inconsistencies between facets of *duPont* and the opinion in *AISI I,* we are willing to accede to the motion to amend the mandate to the extent that it concerns the "range", "guidance" and related issues. In so doing, we adhere to the precept of uniformity in judicial decisionmaking and in the treatment of litigants. Because the interest in avoiding differences in result in cases pending at the same time stands as a valid basis for the recall of a mandate, alteration of the judgment here does not constitute a radically new or unwarranted departure from the strong policy that there be an end to any particular litigation.

C.

■ Although *Greater Boston* did not designate "the public interest" as a specific

reason for granting a "recall" motion, such a concern would seem to be encompassed under the broader rubrics of "good cause" or "special circumstances." The EPA contends that the remand requirements directed in *AISI I,* but not ordered by *duPont,* impose substantial burdens on the agency that will obstruct the effectiveness of the national program of water pollution control. This position is not without merit.

We recognize that development of "ranges", "guidance" factors and the like would constitute a fairly onerous task. As indicated at oral argument, the EPA would have to restructure its methodology for promulgating regulations. In addition, the agency might have to devote substantial manpower in order to satisfy the remand instructions. The result of expending considerable resources so as to comply with *AISI I* might be to impede effective administration of a wide variety of environmental enactments.

Equally significantly, because of the contours of the mandate in *AISI I,* there presently are no regulations applicable to iron and steel manufacturing operations, a major source of effluent discharges into the waters of the United States. The EPA has advised the Court that the absence of such regulations has contributed to delays in the issuance of discharge permits pursuant to § 402 of the Act.[42] Removal of the stringent remand requirements of *AISI I,* and reinstatement of the effluent limitation regulations as originally designed, would serve to expedite the operation of the permit system. And such action may bolster the accomplishment of the central objective of the legislative draftsmen, *viz.,* "to restore and maintain the chemical, physical and biological integrity of the Nation's waters."[43]

Because of these weighty considerations, coupled with the fact that the remand instructions may be unnecessary in light of the *duPont* adjudication, recall of the mandate here would appear to be justified.

42. 33 U.S.C. § 1342.

43. Section 101 of Act, 33 U.S.C. § 1251.

Easing the burdens imposed upon the EPA by *AISI I* will serve the public interest by facilitating the enforcement of the national pollution laws. This is so because the agency will be able to direct its limited resources towards a more effective cleanup of our waterways.

### D.

■ Another basis for granting the EPA the remedy that it requests rests on the character of the original disposition in this case. *AISI I* did not result in the award of a money judgment or in other relief that was inherently final. Rather, in directing the agency to formulate water pollution standards in compliance with the "range" and "guidance" analysis of *AISI I*, this Court rendered an order which necessarily is of a continuing nature. Since the EPA has not yet devised effluent limitations to comport with *AISI I*, the remand obligations currently remain in force.

It would follow that modification of the extant judgment here would not appear to be particularly violative of the elemental precept, discussed above, that there should be a conclusion to a controversy in litigation.[44] Because *AISI I*, at least prior to completion by the agency of the tasks ordered by this panel, cannot be said to have constituted a final adjudication of the dispute concerning the validity of the challenged regulations, recall of the mandate in the present setting thus is not especially disruptive of the interests in finality of judgments.

Had *AISI I*, for example, awarded a money judgment, we would have been far more reluctant to amend the original mandate. And litigants generally should stand as forewarned that the extraordinary remedy granted here may well be confined to instances where litigants are under a continuing duty to satisfy an order of the Court.

### E.

As a final point, we note that the effect on our original judgment of the amendment sought by the EPA will be a relatively modest one. While the decision in *AISI I* constitutes a rather extensive interpretation and analysis of the Act, the EPA seeks to amend or vacate only a minor segment of that lengthy opinion.

Yet the desired modification is not moderate simply in terms of pagination. For, as noted above, we view the vital center of *AISI I* to be the analysis respecting the power of the EPA to promulgate the subject regulations in the first instance. And the motion to recall in no way undercuts— nor could it in light of *duPont*—our conclusion that the EPA possesses the power to design effluent limitation regulations.[45]

Of course, those portions of our opinion that remain intact are largely favorable to the EPA, and so the "recall" motion naturally does not challenge those facets of the *AISI I* opinion. Nonetheless, in light of *duPont* and the decisions of the other courts of appeals respecting the "range", "guidance" and related matters, together with the fact that the *bulk* of our opinion appears to remain viable, we believe that sufficient "good cause" has been evinced to warrant the amendment of our judgment.

### IV.

■ For the reasons articulated in the foregoing opinion, we hold, first, that this Court has the power to recall a mandate in certain limited situations. Second, and to dispel any possible doubts, such relief may be granted only in exceptional circumstances and for good cause. Because this Court ordinarily will view motions to recall a mandate with disfavor, the opinion in this matter should not be read as an invitation to litigants to seek review of already adjudicated claims.

---

**44.** *See* Part II A of this opinion *supra*.

**45.** Additionally, the analysis in *AISI I* regarding the 1977 "BPCTCA" and 1983 "BATEA" stan-

dards in the iron and steel regulations as well as the discussion of other contentions raised by the petitioners have not been undermined by *duPont*. *See* 526 F.2d at 1047–66.

■ Finally, we conclude today that recall of the mandate and modification of the judgment in *AISI I* is warranted because of the *confluence* of several unusual factors: the incongruencies, in certain respects, between the opinion in *AISI I* and the Supreme Court's decision in *duPont*; the solitary position of this Court concerning the "range", "guidance" and related matters, a position contrary to that adopted by every court of appeals that has dealt with the issue; the heavy burdens, contrary to the public interest, that adherence to *AISI I* would impose on the national program of water pollution control; the continuing nature of the obligations placed on the agency in the original panel decision; and the relatively moderate effect of the amendment desired by the EPA on the judgment in *AISI I.*

■ Accordingly, the original mandate will be recalled and the judgment amended insofar as that judgment remanded the effluent limitation regulations to the EPA (1) to establish "ranges" of effluent limitations other than those established by subcategorization; (2) to specify factors to guide the permit writers in selecting limitations other than the guidance provided by the Development Document and related materials; and (3) to reconsider the effluent limitations as promulgated in light of the "base level" and "ceiling" concepts. Such as amendment of the judgment will not affect any other portion of the original decision—specifically, it does not concern Sections I and IV through VII of the opinion in *AISI I.* Section VIII of that decision will be affected only to the extent that the Agency's obligations on remand are modified as specified above.

JAMES HUNTER, III, Circuit Judge, dissenting:

The motion before the court was filed March 22, 1977. It seeks (1) recall of the mandate in *American Iron and Steel Institute v. Environmental Protection Agency,* and (2) amendment of judgment.

The case to which the motion has been addressed was decided November 7, 1975. It is reported at 526 F.2d 1027 (3d Cir. 1975).

The moving party here, the Environmental Protection Agency, never filed a petition for rehearing. Furthermore, we have no record of its having petitioned the Supreme Court for certiorari.

On February 23, 1977, the Supreme Court decided *E. I. duPont de Nemours & Co. v. Train,* 430 U.S. 112, 97 S.Ct. 965, 51 L.Ed.2d 204 (1977).

The majority permits this court, in the "new" light of *duPont,* to open the door to reconsideration of this case through the recall of the mandate and, additionally, to modify its opinion to "conform" to that recent decision.

I respectfully dissent. I would not attempt to reexamine our 1975 decision because of *duPont.* There must be an end to each individual piece of litigation.[1] In the instant case that time has long since past.[2] I do not believe that we can have an orderly system of justice if decisions are allowed to be modified or adjusted to "conform" to subsequent decisions of other courts in other cases.

---

1. *See Baldwin v. Iowa State Traveling Men's Ass'n.,* 283 U.S. 522, 525, 51 S.Ct. 517, 75 L.Ed. 1244 (1931); *Powers v. Bethlehem Steel Corp.,* 483 F.2d 963, 964 (1st Cir. 1973); *Greater Boston Tel. Corp. v. F.C.C.,* 149 U.S.App.D.C. 322, 463 F.2d 268, 278 (1971), *cert. denied* 406 U.S. 950, 92 S.Ct. 2042, 32 L.Ed.2d 338 (1972);

*Collins v. City of Wichita, Kansas,* 254 F.2d 837, 839 (10th Cir. 1958).

2. *See Riha v. International Tel. & Tel. Corp.,* 533 F.2d 1053, 1055 (8th Cir. 1976); *Lee v. Terminal Transport Co.,* 301 F.2d 234, 236 (7th Cir. 1962).