677 F.2d 713
 UNITED STATES of America, Plaintiff-Respondent,
v.
TULARE LAKE CANAL COMPANY, a corporation, Defendant-Petitioner,
Tulare Lake Basin Water Storage District and Salyer Land
Company, a corporation, Intervenors-Defendants.
UNITED STATES of America, Plaintiff-Appellee,
v.
TULARE LAKE CANAL CO., a corp., Defendant,
and
Tulare Lake Basin Water Storage District, Intervenor-Defendant,
and
Salyer Land Co., a corp., Intervenor-Defendant-Appellant.
UNITED STATES of America, Plaintiff-Appellee,
v.
TULARE LAKE CANAL CO., a corp., Defendant-Appellant,
and
Tulare Lake Basin Water Storage District,
Intervenor-Defendant-Appellant,
and
Salyer Land Co., a corp., Intervenor-Defendant.
 Nos. 72-2322, 78-1378 and 78-1422.
 United States Court of Appeals,
Ninth Circuit.
 Argued and Submitted Nov. 13, 1980.
Decided May 17, 1982.
 
 Scott B. McElroy, Dept. of Justice, Washington, D. C., argued, for United States; Charles E. Biblowit, Dept. of Justice, Washington, D. C., on brief.
 Robert M. Newell, Newell & Chester, Los Angeles, Cal., argued, for Tulare Lake Canal Co.; James G. McCain, Corcoran, Cal., on brief.
 Appeal from the United States District Court for the Eastern District of California.
 Before BROWNING, Chief Judge, and DUNIWAY and WALLACE, Circuit Judges.
 BROWNING, Chief Judge:
 
 
 1
 The basic question presented by this lengthy litigation is whether acreage limitations imposed by the federal reclamation laws apply to private lands receiving irrigation benefits from the Pine Flat Project. More specifically, the question is whether owners of more than 160 acres of land within the project area must execute recordable contracts to sell their land in excess of 160 acres at a price excluding incremental value resulting from the existence of the project in order to receive water that would not have been available if the project did not exist. The relevant legal and factual questions are explored in detail in United States v. Tulare Lake Canal Co., 535 F.2d 1093, 1094-96 (9th Cir. 1976) (Tulare I) (No. 72-2322).
 
 
 2
 The United States brought this action in 1963, seeking an injunction enforcing the acreage limitation. The defendants raised both statutory and constitutional defenses. The district court found for defendants on the statutory grounds and did not reach the constitutional questions. 340 F.Supp. 1185, 1188 (E.D.Cal.1972). In Tulare I, we reversed the district court judgment and rejected defendants' statutory defenses. On remand, the district court granted the government's motion for summary judgment on the constitutional issues. Defendants appeal from that ruling in Nos. 78-1378 and 78-1422.
 
 
 3
 Defendant Tulare Lake Canal Company has also filed a "Petition for the Court to Recall its Mandate" in Tulare I based on the Supreme Court's subsequent decisions in California v. United States, 438 U.S. 645, 98 S.Ct. 2985, 57 L.Ed.2d 1018 (1978), and Bryant v. Yellen, 447 U.S. 352, 100 S.Ct. 2232, 65 L.Ed.2d 184 (1980).
 
 I. The Statutory Issues :
 
 4
 Petition to Recall the Mandate in No. 72-2322
 
 
 5
 Tulare argues that it is appropriate to recall the mandate in Tulare I because the decision is "demonstrably wrong," American Iron & Steel Institute v. Environmental Protection Agency, 560 F.2d 589, 594 (3d Cir. 1977), in light of the decisions in California and Bryant. A change in controlling authority or a conviction that the court erred are ordinarily not alone sufficient grounds for recall of a mandate after final judgment. 16 Wright, Miller, Cooper & Gressman, Federal Practice and Procedure: Jurisdiction § 3938 at 284-85. However, since final judgment has not been entered in this case, we consider the effect of California and Bryant on Tulare I under the more flexible "law of the case" doctrine. Kimball v. Callahan, 590 F.2d 768, 771-72 (9th Cir. 1979). We conclude that neither California nor Bryant affects the soundness of Tulare I.
 
 A. California v. United States
 
 6
 As noted at the outset, the question presented in Tulare I was whether the acreage limitation of federal reclamation law applies to the Pine Flat Project. As the issue was presented in Tulare I, the answer turned upon the meaning of the statutes authorizing the project and imposing the acreage limitation. The Pine Flat Project was authorized by the Flood Control Act of 1944, 58 Stat. 887, 901. Section 8 of the 1944 Act provides that dams such as Pine Flat shall be operated "under the provisions of the federal reclamation laws." 58 Stat. 887, 891; 43 U.S.C. § 390. Among the provisions of the federal reclamation laws is Section 46 of the Omnibus Adjustment Act of 1926, 44 Stat. 636, 649-50, 43 U.S.C. § 423e, derived from Section 5 of the Reclamation Act of 1902, 32 Stat. 389, 43 U.S.C. § 431. Section 46 of the 1926 Act provides that lands in excess of 160 acres held by one owner shall not receive water made available by the construction of a project unless the owner executes a contract agreeing to sell the excess land at prices reflecting the value of the excess land without the benefits made available by the project. We held in Tulare I that Congress intended by Section 8 of the Flood Control Act of 1944 to make Section 46 of the Omnibus Adjustment Act of 1926 applicable to the Pine Flat Project.
 
 
 7
 The question presented in California was whether the state may impose conditions upon the appropriation and distribution of water in connection with the New Melones Dam, a federal reclamation project in the Central Valley of California. The answer turned on the meaning of Section 8 of the Reclamation Act of 1902, 32 Stat. 390, 43 U.S.C. § 383, which states that the 1902 Act was not intended to interfere with the laws of any state relating to the appropriation or distribution of water, and that the Secretary of Interior is to proceed in conformity with such laws. The Supreme Court held that, in view of Section 8 of the 1902 Act, the state may impose any condition on the appropriation and distribution of water in a federal reclamation project not inconsistent with Congressional directives respecting the project.
 
 
 8
 Although Section 8 of the 1902 Act is applicable generally to federal reclamation projects, including the Pine Flat Project, and the holding in California is therefore applicable to Pine Flat, the issue resolved in California obviously was not the same as the issue resolved in Tulare I. Tulare Lake Canal Company argues that California nonetheless affects Tulare I for two reasons.
 
 
 9
 The first is that Tulare I relied upon Ivanhoe Irrigation District v. McCracken, 357 U.S. 275, 78 S.Ct. 1174, 2 L.Ed.2d 1313 (1958), and California expressly rejected a dictum from the Ivanhoe opinion. The language in Ivanhoe that was disapproved in California suggests that a state may not impose conditions upon the distribution of water through a federal reclamation project even though the conditions "are not inconsistent with congressional provisions authorizing the project in question." 438 U.S. at 674, 98 S.Ct. at 3000. This language in Ivanhoe was disapproved in California because California held that a state could impose upon the distribution of water through a federal reclamation project any condition that was not inconsistent with Congressional directives for the project.
 
 
 10
 Tulare I did not rely upon the dictum disapproved in Ivanhoe. Tulare I relied instead upon the holding in Ivanhoe, a holding expressly reaffirmed in California. Section 5 of the Reclamation Act of 1902 contains an acreage limitation provision-the forerunner of the acreage limitation in Section 46 of the Omnibus Adjustment Act of 1926, involved in Tulare I. The holding in Ivanhoe was that despite the general command of Section 8 of the Reclamation Act of 1902 that the Secretary of Interior comply with state law, the acreage limitation in Section 5 of the 1902 Act pre-empted the law of California prohibiting such an acreage limitation. 357 U.S. at 291-93, 78 S.Ct. at 1183-85. In California the Supreme Court expressly reaffirmed this holding. 438 U.S. at 668 n.21, 98 S.Ct. at 2997, 438 U.S. at 672 & n.25, 98 S.Ct. at 2999. We relied upon this holding, or upon other aspects of Ivanhoe unrelated to the disapproved dictum, each time we cited Ivanhoe in Tulare I. See 535 F.2d at 1099, 1112, 1113 n.74, 1119, 1120, 1121 n.103, and 1137 n.176.
 
 
 11
 Second, Tulare Lake Canal Company argues that even if the holding of California is not inconsistent with Tulare I, the rationale is. The Company argues that the general tenor of California requires greater deference to state law in the management of federal reclamation prospects, and since California law prohibits acreage limitations in the distribution of irrigation benefits, the decision in Tulare I that the acreage limitation in Section 46 of the 1926 Act applies to the Pine Flat Project despite contrary state law is somehow inconsistent with California. But, as noted, Ivanhoe expressly held that the acreage limitations in section 5 of the 1902 Act pre-empt contrary California law, and California expressly reaffirmed this holding. The company does not state, and we are unable to discover, any reason why the acreage limitation in Section 46 of the 1926 Act should have a different effect.
 
 
 12
 Tulare Lake Canal Company reads California as requiring that state law be followed unless it conflicts with "a 'clear,' 'specific,' or 'explicit' Congressional directive," and argues that the length of the discussion of legislative history in Tulare I "alone demonstrates that Congressional intent to that effect certainly was not 'clear,' 'specific,' or 'explicit.' " There can be no doubt that the Congressional directive to impose the acreage limitation is sufficiently clear, specific, and explicit to pre-empt state law. That is the holding of Ivanhoe that was reaffirmed in California. Our lengthy discussion in Tulare I was directed to another question: whether Congress in the Flood Control Act of 1944 intended to apply this clear, specific, and explicit federal directive to the Pine Flat Project. California has no relevance to this question at all. And even on this question we found the answer clear. After a thorough examination we concluded that "(t)he legislative history leaves no doubt that the 160 acre limitation was intended to apply in the Kings River service area." 535 F.2d at 1098.
 
 
 13
 In sum, although California does require that the United States follow state water law absent a pre-empting federal statute, the same case shows that section 46 of the 1926 Act is precisely such a statute. California strengthened rather than weakened the conclusion we reached in Tulare I.
 
 B. Bryant v. Yellen
 
 14
 The question presented in Bryant was whether the Imperial Valley Irrigation District, which received Colorado River water from the project authorized by the Boulder Canyon Project Act, 45 Stat. 1057, 43 U.S.C. §§ 617-617t, was subject to the acreage limitation in Section 46 of the Omnibus Adjustment Act of 1926. Since Section 14 of the Boulder Canyon Project Act provided that the reclamation laws would apply "except as otherwise herein provided," the Court concluded that Section 46 of the 1926 Act applied to the Imperial Valley district unless its applicability was foreclosed by some other provision of the Boulder Canyon Act. 447 U.S. at 368-69, 100 S.Ct. at 2241-42. The Court found such a bar in the provision of Section 6 of the Boulder Canyon Act that Boulder Canyon Project works were to be used for the "satisfaction of present perfected rights." The court concluded, in light of the section's express language, legislative history, and contemporary construction by government officials, that rights to water from the Colorado that had been acquired in accordance with state laws and exercised by actual diversion and application of a specific quantity of water to a defined area of land before the effective date of the Act were not subject to the 160-acre limitation. 447 U.S. at 368-78, 100 S.Ct. at 2241-46.
 
 
 15
 The provision of Section 6 of the Boulder Canyon Project Act which the Supreme Court read as exempting "present perfected rights" from acreage limitation is central to the decision in Bryant. There is no equivalent exception in the Flood Control Act of 1944, applicable to the Pine Flat Project.
 
 
 16
 Tulare relies on the following language of Section 8 of the 1944 Act:
 
 
 17
 Dams and reservoirs operated under the direction of the Secretary of War may be utilized hereafter for irrigation purposes only in conformity with the provisions of this Section, but the foregoing requirement shall not prejudice lawful uses now existing.
 
 
 18
 (emphasis supplied). As we held in Turner v. Kings River Conservation District, 360 F.2d 184, 193-194 (9th Cir. 1966), however, the italicized language refers to uses to which projects operated by the Secretary of War were being put at the effective date of the 1944 Act. It refers neither to private water rights nor to projects, like Pine Flat, that were not in existence when the 1944 Act was passed.
 
 
 19
 Furthermore, unlike the situation in Bryant, neither legislative history nor contemporaneous administrative interpretation of the statute authorizing the Pine Flat Project (the Flood Control Act of 1944) supports an exemption of the project from the 160-acre limitation. To the contrary, as the opinion in Tulare I demonstrates at length, both the legislative history and administrative construction of the Flood Control Act of 1944 clearly reflect a Congressional intent that the acreage limitations apply to the Pine Flat Project.
 
 
 20
 Equally wide of the mark is Tulare Lake Canal Company's reliance upon the following provision of Section 8 of the 1902 Act:
 
 
 21
 Nothing in this act shall be construed as affecting or intended to affect or to in any way interfere with the laws of any State ... relating to ... water in irrigation, or any vested right thereunder ... and nothing herein shall in any way affect any right of ... any landowner, appropriator, or user of water in, to or from an interstate stream ....
 
 
 22
 As we have pointed out, the Supreme Court in California explicitly reaffirmed its holding in Ivanhoe that the acreage limitation in Section 5 of the 1902 Act preempted contrary state law despite the provisions in Section 8. As we have also noted, the Company has suggested no reason why Section 8 of the 1902 Act should have a different effect upon the acreage limitation in Section 46 of the 1944 Act, involved in Tulare I, than it has upon the acreage limitation in Section 5 of the 1902 Act.
 
 
 23
 Thus the acreage limitation imposed by Section 5 of the 1902 Act and subsequent statutes applies despite Section 8 of that Act unless there is another applicable statutory provision reflecting a congressional intention that it should not apply to the particular project. As we have explained, there is no such provision applicable to the Pine Flat Dam. Even if there were, it would not change the result in Tulare I. Under our decision water rights that existed when the Pine Flat Project was initiated are not affected by the 160-acre limitation. Owners of excess lands may continue to receive all the water to which they were entitled prior to the construction of the project without executing contracts for the sale of the excess lands. See 535 F.2d at 1095 & n.3, 1143-44.
 
 II. The Constitutional Issues:
 Appeals in Nos. 78-1378 and 78-1422
 
 24
 The Supreme Court reviewed and rejected a wide range of constitutional challenges to the imposition of acreage limitations in federal reclamation projects in Ivanhoe Irrigation District v. McCracken, 357 U.S. 275, 294-300, 78 S.Ct. 1174, 1185-88, 2 L.Ed.2d 1313 (1958). The constitutional arguments raised by appellants fare no better.
 
 
 25
 Appellants argue that because the acreage limitation imposed by federal reclamation law do not apply east of the 100o meridian, farmers west of that meridian are denied equal protection of the laws. Differing conditions in different geographic areas may provide a reasonable basis for different legislative treatment. "(T)erritorial uniformity is not a constitutional prerequisite." McGowan v. Maryland, 366 U.S. 420, 427, 81 S.Ct. 1101, 1106, 6 L.Ed.2d 393 (1961). See also Toyota v. Hawaii, 226 U.S. 184, 191, 33 S.Ct. 47, 48, 57 L.Ed. 180 (1912). As the Court noted in California v. United States, supra :
 
 
 26
 the final expansion of our Nation in the 19th century into the arid lands beyond the hundredth meridian of longitude, which had been shown on early maps as the 'Great American Desert,' brought the participants in that expansion face to face with the necessity for irrigation in any way that no previous territorial expansion had.
 
 
 27
 438 U.S. at 648, 98 S.Ct. at 2987. The Reclamation Act of 1902 and the statutes that followed provided the means for funding the massive projects needed to complete the reclamation of the vast arid areas of the west. Id. The reclamation statutes are a rational legislative response to climatic differences between the western region and the remainder of the nation. Provision for acreage limitation are a reasonable means of furthering the public purposes underlying these statutes. Ivanhoe, 357 U.S. at 297, 78 S.Ct. at 1186; Tulare I, 535 F.2d at 1119-20.
 
 
 28
 Appellants argue that "it is unconstitutional for the United States to seek the breakup of large landholdings." Section 46 of the 1926 Act establishes restrictions on the use of water available only because of the construction of the facilities financed by the government. Congress had the power to authorize such projects and to impose reasonable conditions, such as the acreage limitation, "relevant to the federal interest in the project and to the over-all objectives thereof." Ivanhoe, 357 U.S. at 295, 78 S.Ct. at 1185.
 
 
 29
 Appellants assert that Ivanhoe involved government-owned water and a substantial government subsidy, and that the Pine Flat Project involved neither. As pointed out earlier, the acreage limitation applies only to the receipt of water that became available because of the federally financed project. An owner who declines to sell land in excess of 160 acres will continue to receive, for use on all of his lands, all of the water to which he was entitled before the project was built. Tulare I, 535 F.2d at 1095 & n.3, 1143-44. Contrary to appellants' position, the Pine Flat Project did involve a federal subsidy to provide this and other benefits justifying the imposition of reasonable conditions upon receipt of the benefits. Tulare I, 535 F.2d at 1113, 1120-21 & nn.101-06, 1144.
 
 
 30
 Appellants argue that water users had a vested right to be relieved of acreage limitations by paying an allocable share of project construction costs, and that they were deprived of that right without due process of law. But, as we held in Tulare I, 535 F.2d at 1118-43, no such right exists.
 
 
 31
 Finally, appellants argue the district court erroneously refused to allow discovery that would have shown a denial of equal protection in exempting other projects from the acreage limitation but not Pine Flat. Appellants had ample opportunity for discovery during the eight years this case was pending in the trial court prior to the first appeal.
 
 
 32
 The petition to recall the mandate in 72-2322 is DENIED. The judgment of the district court appealed in 78-1378 and 78-1422 is AFFIRMED.
 
 
 33
 WALLACE, Circuit Judge, concurring in the judgment:
 
 
 34
 I join in Part II of the majority's opinion addressing the constitutional issues adjudicated by the district court on remand. I agree with the majority's conclusion in Part I that California v. United States, 438 U.S. 645, 98 S.Ct. 2985, 57 L.Ed.2d 1018 (1978), and Bryant v. Yellen, 447 U.S. 352, 100 S.Ct. 2232, 65 L.Ed.2d 184 (1980), do not affect our holding in Tulare I. I object, however, to the manner in which the majority has treated Tulare Lake Canal Company's argument concerning section 8 of the 1902 Act, and write separately to emphasize that our decision should not be construed as permitting the 160-acre limitation to apply to the receipt of waters to which private landowners have riparian or appropriative rights previously vested under state law.
 
 
 35
 Along with the majority, I do not believe that California or Bryant undercut the Supreme Court's holding in Ivanhoe Irrigation Dist. v. McCracken, 357 U.S. 275, 78 S.Ct. 1174, 2 L.Ed.2d 1313 (1958) (Ivanhoe ). I agree that the Flood Control Act of 1944 contains no express provision exempting "present perfected rights" comparable to that of the project statute involved in Bryant. I also join the majority's holding in Part I(B): Section 8 of the 1902 Act does not affect our decision because "(o)wners of excess lands may continue to receive all the water to which they were entitled prior to construction of the Pine Flat Project without executing contracts for the sale of excess lands." Ante, at 718. Tulare Lake Canal Company admits that the contract in this case expressly applies only to water "stored by means of the Pine Flat Dam and Reservoir and thereafter ... released at times when it would not have been available in the absence of such storage and release ...." It is clear that the water subject to the acreage limitation simply would not have been available to the landowners if the project did not exist. Therefore, applying the acreage limitation to water covered by the contract does not interfere with the vested water rights of any of the parties. The landowners will continue to receive all the water to which they have pre-existing riparian or appropriative rights vested under California law free of the 160-acre limitation.
 
 
 36
 That disposes of the issue and it is unnecessary to venture beyond. But the majority opinion could be read to imply that Ivanhoe permits the acreage limitation to apply to the receipt of water stored by means of a federal reclamation or flood control project whether or not riparian or appropriative rights to that water had previously been vested pursuant to state law. If that is what the majority means, I do not join the dictum. The definition of "project water" in the contract involved here, quoted previously, excludes vested state water rights from the 160-acre limitation. That is sufficient to establish that our holding does not "interfere with the laws of any State ... relating to the control, appropriation, use, or distribution of water used in irrigation, or any vested right acquired thereunder" or "affect any right of any ... landowner, appropriator, or user of water in, to, or from any interstate stream or the waters thereof" within the meaning of section 8 of the 1902 Act.
 
 
 37
 If forced to resolve this issue, I doubt I could agree with the extremely broad construction of Ivanhoe suggested by the majority. In Ivanhoe, the Court refrained from "passing generally on the coverage of § 8 in the delicate area of federal-state relations in the irrigation field," 357 U.S. at 292, 78 S.Ct. at 1184, and emphasized twice that if the United States finds it necessary to acquire water rights to operate a reclamation project, or if enforcement of the acreage limitation interferes with any compensable water rights, the government must pay just compensation for the vested rights so taken.[1] Id. at 291, 297, 78 S.Ct. at 1183, 1186. See also Dugan v. Rank, 372 U.S. 609, 625-26, 83 S.Ct. 999, 1009-10, 10 L.Ed.2d 15 (1963). The contracts involved in Ivanhoe, like those before us here, "applie(d) only to 'project water' and previously existing water supplies (were) unaffected thereby." 357 U.S. at 285, 78 S.Ct. at 1181. Thus, in Bryant the Court wrote that Ivanhoe did not involve "perfected rights to water that the project there involved would furnish ...." 447 U.S. at 372, 100 S.Ct. at 2243. In other words, it appears that Ivanhoe involved only reclamation water to which no riparian or appropriative rights had vested under California law.[2] As the Court later explained in California, its holding in Ivanhoe was simply that the acreage limitation preempts any contrary state law, and thus section 8 of the 1902 Act did not require the United States to comply with "California law (which) forbade the 160-acre limitation on irrigation water deliveries expressly written into § 5 of the Reclamation Act of 1902." 438 U.S. at 671, 98 S.Ct. at 2999. Citing section 8, however, the Court in California emphasized that the 1902 Act "clearly provided that state water law would control in the appropriation and later distribution of the (reclamation) water," id. at 664, 98 S.Ct. at 2995, and that "(t)he legislative history ... makes it abundantly clear that Congress intended to defer to the substance, as well as the form, of state water law." Id. at 675, 98 S.Ct. at 3001.
 
 
 38
 None of this is particularly surprising. Conversely, it would be unusual if the Supreme Court in Ivanhoe had in fact allowed the acreage limitation to apply to water beneficially "owned" by private landowners without ever expressly addressing whether such application is an unconstitutional taking. See Ivanhoe, supra, 357 U.S. at 295-97, 78 S.Ct. at 1185-87 (acreage limitation did not "deprive appellees of any rights to property or water"). In one of its earliest cases involving the federal reclamation laws, the Court recognized that "Congress proceeded on the basis of full recognition of water rights having valid existence under state law," United States v. Gerlach Live Stock Co., 339 U.S. 725, 734, 70 S.Ct. 955, 960, 94 L.Ed. 1231 (1950), and that the Court had never held "anything like" the proposition that "the Government could destroy the flow of a navigable stream and carry away its waters for sale to private interests without compensation to those deprived of them." Id. at 737, 70 S.Ct. at 962. "Congress has recognized the property status of water rights vested under California law." Id. at 736, 70 S.Ct. at 961.
 
 
 39
 Because the contracts involved here also recognize the property status of whatever riparian and appropriative water rights were previously vested in the landowners under California law, I concur in the judgment. But I must reject the majority's sweeping and unnecessary dicta to the extent they suggest that Ivanhoe would allow elimination of those rights without compensation.
 
 
 
 [1]
 In an earlier case involving the Pine Flat Project, Turner v. Kings River Cons. Dist., 360 F.2d 184 (9th Cir. 1966), we held that the Flood Control Act of 1944 incorporates those provisions of the reclamation laws which permit the United States to condemn and pay just compensation for vested water rights taken in connection with the construction or operation of the dam. See United States v. Tulare Lake Canal Co., 535 F.2d 1093, 1096 (9th Cir. 1976)
 
 
 [2]
 As the California Supreme Court pointed out in its Ivanhoe opinion, the United States had acquired by assignment all "riparian, appropriative and prescriptive rights" to the "domestic" waters necessary to operate the Central Valley Project. Ivanhoe Irrigation Dist. v. All Parties, 47 Cal.2d 597, 618-19, 306 P.2d 824 (1957). See Ivanhoe Irrigation Dist. v. McCracken, 357 U.S. 275, 285, 78 S.Ct. 1174, 1180, 2 L.Ed.2d 1313 (1958) (describing purchases and acquisitions of water rights by United States), rev'g, 47 Cal.2d 597, 306 P.2d 824 (1957). The California court held that "(t)he water users of the state whose rights have not become vested ... have an inchoate right to (an adequate supply of water) subject to like enforcement and equal protection of the law," Ivanhoe Irrigation Dist. v. All Parties, supra, 47 Cal.2d at 626, 306 P.2d 824 (emphasis added), as the beneficiary of a trust relationship into which the United States had stepped by executing the contracts. This is perfectly consistent with the conclusion that whatever water rights were involved in Ivanhoe had not been vested under state law. See also id. at 627, 306 P.2d 82 (conclusion with respect to title to "unappropriated domestic waters" in the state); cf. Bryant v. Yellen, 447 U.S. 352, 371 n.23, 100 S.Ct. 2232, 2243, 65 L.Ed.2d 184 (1980) (describing approach of California courts to Ivanhoe litigation)